**GARGOYLES, INC. and Pro–Tec, Inc., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

No. 342–88C.

United States Court of Federal Claims.

Sept. 30, 1994.

Paul T. Meikeljohn and George B. Fox, Seattle, WA, for plaintiffs.

Steven M. Amundson, Civ. Div., Dept. of Justice, Washington, DC, with whom were Frank W. Hunger, Asst. Atty. Gen., and Vito J. DiPietro, Director, for defendant.

## OPINION

MARGOLIS, Judge.

This patent case comes before the court on remand from the United States Court of Appeals for the Federal Circuit. Plaintiffs, Gargoyles, Inc. ("Gargoyles") and Pro-tec, Inc. ("Pro-tec"), brought suit in this court pursuant to 28 U.S.C. § 1498(a),[1] seeking damages for the infringement of a design patent and a utility patent. After a five-day trial, this court found that defendant, acting through the United States Army ("Army"), had not infringed plaintiffs' patents. The Federal Circuit affirmed this court's judgment of noninfringement of the design patent and findings of no literal infringement of claims 2 and 8 of the utility patent. The

Federal Circuit remanded for reconsideration of literal infringement as to claim 1, and reconsideration of the doctrine of equivalents as to claim 1, if it applies, and claims 2 and 8 of the utility patent. *Gargoyles, Inc. v. United States,* 6 F.3d 787 (Fed.Cir.1993). On further consideration, this court finds the accused device literally infringes claim 1 of plaintiffs' utility patent and infringes claim 8 of that patent under the doctrine of equivalents. This court further finds that defendant has not established by clear and convincing evidence that the utility patent is invalid.

## FACTS

The United States Patent and Trademark Office ("PTO") issued to Pro-tec U.S. Patent No. 4,741,611 ("utility patent" or " '611 patent") on May 3, 1988. Pro-tec assigned the '611 patent to Gargoyles. The utility patent discloses eyeglasses with toric, zero power lenses that are integrally formed with a bridge and have substantial wrap depth. Other features of the eyeglasses include a nosepiece surrounding a bridge that is capable of absorbing shocks and temples that are attached to the lenses rather than a frame.

The Army purchased from American Optical ("AO") several hundred thousand pairs of ballistic/laser protective spectacles ("B/LPS" or "accused device"). Plaintiffs allege that the B/LPS infringes claims 1, 2 and 8 of the utility patent.[2] Plaintiffs further allege that defendant violated 28 U.S.C. § 1498(a) by

---

1. Section 1498(a) reads, in pertinent part:

 Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.

2. These claims of the '611 patent, at col. 4, l. 10–28, 52–56, read as follows:

 1. Eyeglasses especially adapted for sports use, comprising:
 a pair of lenses and a bridge integrally formed with each other, said lenses having a relatively small height, a relatively large width and substantial wrap depth in the horizontal dimen-

sion, said lenses further having toric inner and outer surfaces which have radii of curvatures that are selected to provide zero power; a pair of temples pivotally secured to the outer edges of respective lenses; and a nosepiece secured to said bridge, said nosepiece having a pair of nosepads adapted to contact and conform to the nose of the wearer.

 2. The eyeglasses of claim 1 wherein said nosepiece includes a base portion tightly surrounding said bridge while remaining free of rigid connection thereto so that said nosepiece is capable of absorbing shocks imparted to said lenses.

 \* \* \* \* \* \*

 8. The eyeglasses of claim 1, further including a pair of mounting pads integrally formed at the outer edges of respective lenses, and a hinge having one mounting leg embedded in each mounting pad and another portion secured to a respective temple.

having the B/LPS manufactured and using them without a license from plaintiffs.

Defendant denies that the B/LPS eyewear infringes the '611 patent and challenges the validity of the patent, asserting that the utility patent is obvious in light of prior art; that plaintiffs' eyewear was in public use and on sale more than one year before the filing of the '611 patent; that the patent fails to properly name the inventors of the claimed subject matter; that the patent fails to set forth the best mode contemplated by the inventor of carrying out his invention; and that the patent is unenforceable because of inequitable conduct of Pro-tec and inventor Dennis Burns in the patent application process.

## DISCUSSION

### I. Infringement

The court begins its inquiry by examining alleged literal infringement of claim 1, and examining the doctrine of equivalents as to claims 2 and 8 of the utility patent.[3] To prevail, plaintiffs must prove infringement by a preponderance of the evidence. *See Lemelson v. United States,* 752 F.2d 1538, 1547 (Fed.Cir.1985).

### A. Literal Infringement of Claim 1

■ As to claim 1 of the '611 patent, "[a] finding of literal infringement requires that the asserted claims, as properly construed, read on the accused product." *Morton Int'l, Inc. v. Cardinal Chemical Co.,* 5 F.3d 1464, 1468 (Fed.Cir.1993). Defendant denies that the accused device literally infringes that portion of claim 1 concerning zero power and substantial wrap depth. In light of the evidence presented at trial, the court finds that plaintiffs have established by a preponderance of the evidence that the accused device literally infringes the remaining elements of claim 1. The court limits it analysis to the zero power and substantial wrap depth elements of the claim.

■ The utility patent claims lenses "having toric inner and outer surfaces which have radii of curvatures [sic] that are selected to

provide zero power." U.S. Patent No. 4,741,-611, ccl. 4, l. 16–18. The terms of a claim "will be given their ordinary meaning, unless it appears that the inventor used them differently." *ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1579 (Fed.Cir.1988). To determine if the inventor used a term differently than its ordinary accustomed meaning, the court should consider the specification and prosecution history. *Id.* at 1580; *see Hormone Research Foundation v. Genentech, Inc.,* 904 F.2d 1558, 1562 (Fed.Cir. 1990), *cert. dismissed,* 499 U.S. 955, 111 S.Ct. 1434, 113 L.Ed.2d 485 (1991). Witnesses for both parties testified that zero power means non-corrective or nonprescription lenses to one skilled in the art. The accused device has non-corrective lenses. The court finds the accused device has zero power within the term's ordinary meaning.

The utility patent also claims "substantial wrap depth." U.S. Patent No. 4,741,611, col. 4, l. 15–15. Although the specification states that "an object of the invention [is] to provide eyeglasses having sufficient wrap depth to adequately shield the eye," U.S. Patent No. 4,741,611, col. 1, l. 57–59, the claim, not the specification, measures the invention. *Environmental Designs, Ltd. v. Union Oil Co.,* 713 F.2d 693, 699 (Fed.Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984). Thus, the court cannot limit the meaning of substantial wrap depth by requiring a specific measure of eye protection. Review of the prosecution history reveals the examiner rejected the claimed invention as obvious based on the combination of U.S. Patent No. 2,406,608 to Joyce and U.S. Patent No. 1,536,828 to Drescher, and that the patentee distinguished the combination of Joyce and Drescher by stating "[t]he resulting lens would not have the substantial wrap depth, which is a critical aspect of applicant's invention." Amendment of May 22, 1987, at 5, l. 8–9. The prosecution history (or file wrapper) "limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain

---

**3.** Because the court finds the accused device literally infringes claim 1, it need not apply the

doctrine of equivalents to that claim.

claim allowance." *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir.1985). The court finds that the term "substantial wrap depth" means wrap depth greater than that of eyeglasses resulting from the combination of Joyce and Drescher.

The parties dispute whether the wrap depth of the accused device is substantial. Ronald Tillen, an employee of the manufacturer of the accused device, stated at his deposition that the wrap depth of the accused device was not substantial because it "is insufficient to give *full peripheral protection.*" Tillen deposition, at 66 (emphasis added). This testimony is not persuasive because the patent claims substantial wrap depth, not wrap depth sufficient to give full peripheral eye protection. Plaintiffs' witnesses suggest the accused device has substantial wrap depth because it has wrap depth similar to or greater than the Gargoyles eyewear. However, the court cannot merely compare the B/LPS eyewear with the Gargoyles product to determine whether the accused device has substantial wrap depth, or accept such comparison by the parties' witnesses. Infringement is determined by comparing the accused device with the patent claims, not with a commercial embodiment of the patentee's claimed invention. *Martin v. Barber*, 755 F.2d 1564, 1567 (Fed.Cir.1985).

Dennis Burns, inventor of the claimed subject matter, testified that substantial wrap depth refers to a wrap-around lens such as the lens of the commercially marketed Gargoyles eyewear. Burns further testified that the B/LPS eyewear has substantial wrap depth within the meaning of claim 1. The court finds the accused device has substantial wrap depth within the meaning of claim 1 of the utility patent. Because the accused device has both zero power and substantial wrap depth, the court concludes that the B/LPS eyeglasses literally infringe claim 1 of the '611 patent.

**B. Infringement of Claims 2 and 8 under the Doctrine of Equivalents**

The court's findings of no literal infringement of dependent claims 2 and 8 of the utility patent were affirmed by the Federal Circuit. Therefore, the court analyzes infringement of those claims under the doctrine of equivalents.

Infringement *may* be found under the doctrine of equivalents if an accused product "performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention." *Wilson Sporting Goods Co. v. David Geoffrey & Assoc.*, 904 F.2d 677, 683 (Fed.Cir.), *cert. denied*, 498 U.S. 992, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990) (emphasis in original, citations omitted). However,

[I]n applying the doctrine of equivalents, each limitation must be viewed in the context of the entire claim.... "It is ... well settled that each element of a claim is material and essential, and that in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device." *Lemelson v. United States*, 752 F.2d 1538, 1551, 224 U.S.P.Q. 526, 533 (Fed.Cir.1985) (footnote omitted). To be a "substantial equivalent," the element substituted in the accused device for the element set forth in the claim must not be such as would substantially change the way in which the function of the claimed invention is performed.

*Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 935 (Fed.Cir.1987), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988) (citing *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532–33, 3 U.S.P.Q.2d 1321, 1324–25 (Fed.Cir.1987)). Because claims 2 and 8 are dependent on claim 1 and the court has found literal infringement of claim 1, the court may focus on the additional elements of claims 2 and 8 in applying *Pennwalt*.

■ Claim 2 describes "[t]he eyeglasses of claim 1 wherein said nosepiece includes a base portion tightly surrounding said bridge while remaining free of rigid connection thereto so that said nosepiece is capable of absorbing shocks imparted to said lenses." U.S. Patent No. 4,741,611, col. 4, l. 24–28. The nosepiece of the accused device is fastened to the bridge by snapping a tongue-and-groove arrangement along the top of the spectacles and by grooves in the lower exten-

sions of the nosepiece. Burns testified that the nosepiece of the B/LPS eyeglasses met the recitations of claim 2 in that the accused device's nosepiece can absorb shock. Trial Transcript ("Tr.") at 83–84.

The overall function of the nosepiece described in claim 2, the substitute element of the *Pennwalt* analysis, is absorption of shock imparted to the lenses. The accused nosepiece snaps rigidly to the bridge of the B/LPS eyeglasses. Other than Burns' equivocal testimony, there is no evidence that the B/LPS nosepiece is capable of absorbing shock imparted to the lenses. Moreover, the nosepiece does not surround tightly the bridge of the accused device while remaining free of rigid connection thereto. Instead, the nosepiece snaps onto the lenses along the top of the spectacles and along the lower portions of the bridge. The court finds plaintiffs have not met their burden of showing the nosepiece of the accused device "performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention." *Wilson Sporting Goods,* 904 F.2d at 683. Therefore, the court finds the B/LPS eyeglasses do not infringe claim 2 of the utility patent under the doctrine of equivalents.

■ Claim 8 describes "[t]he glasses of claim 1, further including a pair of mounting pads integrally formed at the outer edges of respective lenses, and a hinge having one mounting leg embedded in each mounting pad and another portion secured to a respective temple." U.S. Patent No. 4,741,611, col. 4, l. 52–56. The accused device has integrally formed mounting posts at the outer edges of respective lenses and each temple piece incorporates two integrally formed arms which define a slot. Each temple piece is attached to the lenses by inserting the mounting post into the slot and inserting a hinge pin. The B/LPS eyeglasses do not require separate hinges.

The overall function of the temple and hinge arrangement described in claim 8 is to attach the temple pieces directly to the lenses and allow movement of the temple pieces between open and closed positions. Although the B/LPS eyeglasses eliminate the need for separate conventional hinges, the accused device, like the claimed invention, employs a hinge arrangement at the outer edges of the lenses to allow movement of the temple pieces along a ninety degree arc between open and closed positions. The court finds the temple and hinge arrangement of the accused device performs substantially the same function in substantially the same way to obtain substantially the same overall result as the claimed invention. *Wilson Sporting Goods,* 904 F.2d at 683. However, even if the tripartite test of function, way and result is met, "there can be no infringement if the asserted scope of equivalency of what is literally claimed would encompass prior art." *Id.* (citations omitted). In order to determine whether prior art limits the range of equivalents, the court must,

> visualiz[e] a *hypothetical* patent claim, sufficient in scope to *literally* cover the accused product. The pertinent question then becomes whether the hypothetical claim could have been allowed by the PTO over prior art. If not, then it would be improper to permit the patentee to obtain that coverage in an infringement suit under the doctrine of equivalents. If the hypothetical claim could have been allowed, then *prior art* is not a bar to infringement under the doctrine of equivalents.

*Id.* at 684 (emphasis in original).

A hypothetical claim sufficient in scope to literally cover the accused product in this case includes all the elements of claim 1 and the temple and hinge arrangement of the B/LPS eyeglasses. Defendant argues that the accused hinge arrangement is essentially the same as the hinge arrangement used in pressure suit spectacles developed for the National Aeronautics and Space Administration ("NASA") and, consequently, a hypothetical claim broad enough to literally cover the B/LPS would read on prior art and would be unpatentable.

The court first notes significant differences between the temple and hinge arrangements of the B/LPS and NASA spectacles. The accused device employs thin, conventional temple pieces which are secured to the lenses by insertion of a plastic, expandable hinge

pin. The NASA spectacles employ relatively wide, spatula-type temple pieces, brass rivets to secure the temple pieces to the lenses, and a different mounting post configuration. Moreover, the fact that additional limitations may be found in prior art does not mean that a hypothetical claim sufficient in scope to encompass the accused product would not have issued. A combination of elements may be patentable whether it be composed of elements all new, partly new, or all old. *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1546 (Fed.Cir.1984).

The court finds that a hypothetical claim which includes the elements of claim 1 of the utility patent and the temple and hinge arrangement of the B/LPS eyeglasses could have been allowed by the PTO over prior art. The court further finds the accused device infringes claim 8 of the '611 patent under the doctrine of equivalents.

## II. Validity

■ Defendant argues the utility patent is invalid because plaintiffs' invention was obvious in light of prior art; plaintiffs' eyewear was in public use and on sale more than one year before the filing of the '611 patent; the patent fails to name all of the inventors of the claimed subject matter; the patent fails to set forth the best mode of carrying out the invention; and because of plaintiff's inequitable conduct during the patent application process.

Under 35 U.S.C. § 282, a patent is presumed valid, and the one attacking validity has the burden of proving invalidity by clear and convincing evidence. Notwithstanding that the introduction of prior art not before the examiner may facilitate the challenger's meeting the burden of proof on invalidity, the presumption remains intact and on the challenger throughout the litigation, and the clear and convincing standard does not change.... the presumption of validity goes to the validity of the patent in relation to the patent statute *as a whole,* not just to nonobviousness under section 103.

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed.Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987) (emphasis in original, citations omitted). For the reasons set forth below, the court finds defendant has failed to establish by clear and convincing evidence that the '611 patent is invalid.[4]

### A. Obviousness

■ A patent is invalid if:

the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103. To determine whether an invention would have been obvious at the time it was made, the court must consider the scope and content of the pertinent prior art, the differences between the prior art and the claims at issue, and resolve the level of ordinary skill in the pertinent art. Secondary considerations such as commercial success, long felt but unsolved needs, and failure of others to invent are also relevant to the obviousness inquiry. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966); *Ryko Manufacturing Co. v. Nu–Star, Inc.*, 950 F.2d 714, 716 (Fed. Cir.1991).

Under *Graham*, the court must first consider the scope and content of prior art. The relevant art is defined as that "reasonably pertinent to the particular problem with which the inventor was involved." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1535 (Fed.Cir.1983) (citations omitted). In this case, the inventor was concerned with making nonprescription eyewear with appropriate aesthetic and ballistic characteristics. Thus, the scope of the relevant art is that reasonably pertinent to nonprescription eyewear design.

The content of the pertinent prior art includes references cited in the utility patent: U.S. Design Patent 178,178 (pair of sun-

---

4. The court need not find a patent valid; it is necessary to hold only that a challenger to a patent's validity failed to prove invalidity. *See*

*Rosemount, Inc.*, 727 F.2d at 1543 n. 2; *see also Environmental Designs, Ltd.*, 713 F.2d at 699–700 n. 9.

glasses), U.S. Design Patent 178,179 (pair of sunglasses), U.S. Design Patent 199,150 (spectacle front), U.S. Patent No. 3,605,116 (industrial spectacles), and U.S. Patent No. 3,713,732 (two-piece goggle construction). In addition, U.S. Patent No. 3,526,449 (one-piece sunglasses) and U.S. Patent No. 2,537,047 (ophthalmic lens for spectacles affording increased field of vision) were cited in the background art sections of the original and continuing patent applications. The patent examiner also considered U.S. Patent No. 1,536,828 (method of making toric lenses and lenses blanks), U.S. Patent No. 2,406,608 (eye protection means and method of making same), U.S. Patent No. 3,345,121 (adjustable nosepiece for eyeglass frame), U.S. Patent No. 3,476,468 (nosepiece for rocking connection to ophthalmic mounting) and French Patent No. 1,185,637 (improvement of safety glasses). Defendant argues that the court should consider NASA's pressure suit spectacles and NYLSUN safety glasses, which were sold in the United States during the 1960's and 1970's, as pertinent prior art.

*Graham* next requires the court analyze the differences between the prior art and the claims at issue. *Graham,* 383 U.S. at 17, 86 S.Ct. at 693–94. Defendant argues the utility patent is obvious and thus invalid in light of three items of prior art, taken alone or in various combinations with each other or other prior art.[5] Defendant bases its obviousness argument on the three items of prior art: U.S. Patent No. 2,537,047 (" '047 patent" or "Gatten patent"); the NASA spectacles; and the NYLSUN eyewear. Moreover, defendant limits its obviousness argument to the elements of claim 1. Therefore, the court confines its obviousness analysis to claim 1 and the prior art cited by defendant.

The Gatten patent discloses ophthalmic lenses for spectacles affording increased field of vision. Significant differences exist between the Gatten patent and the '611 patent. The '047 patent is directed to prescription lenses having substantial power unlike the non-prescription lenses of the patent-in-suit. Furthermore, it is unclear whether the Gatten patent is directed to bitoric lenses or toric lenses such as those disclosed in the utility patent.[6] The drawings in the Gatten patent portray eyeglasses significantly different in appearance from the claimed invention; the Gatten spectacles appear to have the bug-eyed look that the claimed invention seeks to eliminate. The court also notes that the '047 patent was cited in the background art sections of the applications before the patent examiner.

The NASA spectacles do not perform in substantially the same way as the invention claimed in the '611 patent. Defendant admits the NASA spectacles have spherical lenses[7] rather than the claimed toric lenses. The utility patent was directed to the problems associated with the use of spherical lenses and cites U.S. Patent No. 3,526,449 (" '449 patent" or "Bolle patent") in reference to those problems. The Bolle patent discloses one-piece sunglasses with spherical lenses. Like the NASA spectacles, the spectacles disclosed in the '449 patent have a bug-eyed appearance and relatively wide temple pieces, problems to which the claimed invention is directed. *See* U.S. Patent No. 4,741,-611, col. 1, l. 23–31. To the extent that the NASA spectacles are prior art, they are no more pertinent than the '449 patent cited in the utility patent.

The NYLSUN eyeglasses are nonprescription, protective spectacles which have a separate, partial frame securing non-integral

---

**5.** Defendant also argues that plaintiffs' alleged trade show activities involved other pertinent prior art. Those issues are discussed in section II(B), *infra.*

**6.** Toric lenses have different radii of curvature in the horizontal and vertical meridians. Bitoric lenses would have two different radii of curvature in each meridian. In describing the invention, the '047 patent states, "[t]he inner surface of the lens is a toric curvilinear surface which is continuous, and the horizontal meridian of said surface, throughout the 90° hereinafter men-

tioned, is preferably on the same radius." '047 Patent, at col. 2, lines 36–40. This language suggests toric lenses. However, the patent claims spectacles having lenses "the inside and outside surfaces of each of said lenses being bitoric." '047 Patent, at col. 4, l. 45–47. The patent also claims "lenses each having a principal portion and an extension." '047 Patent, at col. 4, l. 34–36. The language in claim 1 of the Gatten patent suggests bitoric lenses.

**7.** Spherical lenses have the same radii of curvature in the horizontal and vertical meridians.

lenses which appear to have a slight degree of toricity. The NYLSUN eyeglasses are nearly identical to the industrial spectacles disclosed in U.S. Patent No. 3,605,116 (" '116 patent" or "Simpson patent") noted in the references cited section of the utility patent. The only material difference between the NYLSUN eyewear and the spectacles disclosed in the Simpson patent is the slight toricity apparent in the NYLSUN eyeglasses. However, the slight toricity of the NYLSUN eyewear may not have been present when the utility patent was filed. The NYLSUN lenses are made from flexible material and are inserted into a rigid frame. Under these circumstances, spherical lenses can deform slightly and become somewhat toric. Advertisements for the NYLSUN eyewear do not disclose toric lenses, a novel feature which would have been promoted.

The level of ordinary skill in the pertinent art, the third element of the *Graham* analysis, may be determined by inquiring into the types of problems encountered in the art, prior art solutions to those problems, the rapidity with which innovations are made, the sophistication of the technology, and the education level of active workers in the field. *Custom Accessories, Inc. v. Jeffrey–Allan Industries, Inc.*, 807 F.2d 955, 962 (Fed.Cir. 1986). The experience level of active workers in the field is also relevant. *Ryko Manufacturing Co.*, 950 F.2d at 718. The pertinent field is that of nonprescription eyewear design.

The types of problems encountered in the pertinent art are development of appropriate ballistic and aesthetic properties. The prior art solutions include the use of spherical lenses with larger radii of curvature, the use of bitoric lenses or lenses with varying radii of curvature in the horizontal meridian, and some use of integral lenses for enhanced ballistic characteristics. Innovations in the field are made relatively slowly. Although the technology of optical engineering and eyeglass manufacturing is fairly sophisticated, a person of ordinary skill in nonprescription eyewear design would require familiarity with, not expertise in, those areas. A person of ordinary skill would have been working in the field for perhaps five years.

The court must consider secondary factors such as commercial success, long-felt need, and failure of others to invent before reaching a conclusion as to obviousness. *Hybritech, Inc.*, 802 F.2d at 1380. Although the eyewear did not sell very well when first introduced, the Gargoyles eyeglasses have achieved significant commercial success. Defendant argues that the commercial success of the Gargoyles eyewear is due to factors unrelated to the features of the claimed invention, such as advertising. Plaintiffs respond that sales of Gargoyles eyewear, especially those to the Army and Army personnel, are directly attributable to the features disclosed in the '611 patent. The court finds there is a sufficient nexus between the nature of the claimed invention and commercial success to give such commercial success weight in the obviousness analysis. *See Cable Electric Prod., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1027 (Fed.Cir.1985).

Through the testimony of Colonel Francis G. LaPiana, an ophthalmologist at the Walter Reed Army Medical Center, plaintiffs presented substantial evidence of the Army's long-felt need to provide ballistic eye protection with appropriate aesthetic characteristics to soldiers. Defendant's evidence that a primary purpose of the recent B/LPS eyewear program was protection against laser threats does not dilute plaintiffs' showing. Plaintiffs have also presented substantial evidence of both initial skepticism that eyeglasses with the appropriate ballistic and aesthetic properties were feasible and failure of others to invent such eyeglasses. The court finds that evidence of long-felt need, initial skepticism and failure of others to invent weighs in favor of nonobviousness.

The court finds that none of the prior art references, either singly or in combination, suggests the desirability, and thus the obviousness, of designing nonprescription eyewear with integral, toric lenses and substantial wrap depth to achieve appropriate ballistic and aesthetic properties. *See In re Deminski*, 796 F.2d 436, 442 (Fed.Cir.1986). The teachings of the Gatten patent are, at best, confusing and are directed to lenses with substantial power. Furthermore, the possible integral lens configuration of the Gatten

spectacles does not address the ballistic protection concerns of the claimed invention. The NASA spectacles and the Bolle patent teach the use of spherical lenses, and the Bolle one-piece sunglasses do not have substantial wrap depth. In fact, the '611 patent issued over the Gatten and the Bolle patents, both of which were cited in the background art sections of the applications before the patent examiner. The material features of the NYLSUN eyeglasses were considered by the patent examiner in the Simpson patent. Furthermore, assuming *arguendo* that the NYLSUN eyewear had slight toricity before the invention was made and can be considered prior art, the court finds that the term "toric" as used in claim 1 of the utility patent reads on eyewear with toricity greater than the insignificant toricity of the NYLSUN lenses. *See Smith v. Snow,* 294 U.S. 1, 14, 55 S.Ct. 279, 284, 79 L.Ed. 721 (1935), *reh'g denied,* 301 U.S. 671, 57 S.Ct. 934, 81 L.Ed. 1335 (1937) (if possible, construe claims to sustain their validity); *see also Grain Processing Corp. v. American Maize–Products Co.,* 840 F.2d 902, 908 (Fed.Cir.1988) (claims construed in light of the specification and prosecution history).

In light of the scope and content of the pertinent prior art, the differences between the prior art and the claims at issue, the level of ordinary skill in the pertinent art and secondary considerations of nonobviousness, the court finds defendant has failed to establish by clear and convincing evidence that the claimed invention would have been obvious to a person of ordinary skill in the pertinent art at the time the invention was made.

## B. Public Use and On–Sale Bars

A person shall be entitled to a patent unless "the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). Because the original application for the '611 patent was filed on March 26, 1981, the critical date for purposes of section 102(b) is March 26, 1980. Defendant alleges that plaintiffs' marketing activities prior to the critical date included public use of and offers to sell the Gargoyles eyewear.

Defendant primarily relies on the testimony of Jerry R. Boquist, a terminated employee of Pro-tec, and photographs allegedly taken by Boquist prior to the critical date. Boquist testified that Gargoyles eyeglasses were on sale, and that eyeglasses and advertisements disclosing the utilitarian feature of the eyeglasses were displayed at certain trade shows, prior to the critical date. The photographs show Gargoyles eyewear on display at one or more trade shows, but Boquist's testimony is the only direct evidence concerning the date on which those photographs were taken. Boquist's recollection of events which took place more than a decade ago changed during the course of proceedings. For example, in response to a pretrial inquiry from defendant and after reviewing diaries, expense records, and the photographs, Boquist concluded that he took the photographs at a Las Vegas motorcycle show and made a notation to that effect on the back of one of the photographs. The Las Vegas motorcycle show was held annually in October. Exhibition of Gargoyles eyewear and advertisement in October, 1979 was not possible because the eyeglasses were first manufactured in January, 1980. Exhibition in October, 1980 would have been after the critical date. Boquist later testified that the photographs were taken at a January, 1980 trade show in Anaheim, California.

Defendant also relies on the testimony of L. Peter Frieder, president of Gentex. Gentex was the actual manufacturer of the Gargoyles eyeglasses and had been engaged in previous litigation with plaintiffs. Although Frieder corroborates certain aspects of Boquist's testimony, Frieder's recollection of events which occurred during 1979 and 1980 is incomplete. Plaintiffs' witnesses directly contradicted Boquist and Frieder by testifying that no Gargoyles eyeglasses were offered for sale and no eyeglasses or advertisements disclosing the features of Gargoyles were displayed prior to the critical date. Under these circumstances, the court cannot attach much weight to the testimony of Boquist or Frieder, or to Boquist's photo-

graphs.[8] *See Kornylak Corp. v. United States*, 207 U.S.P.Q. 145, 159 (Ct.Cl.1980). Plaintiffs admit, however, they attended several trade shows to prepare for the introduction of Gargoyles eyewear and displayed a high-contrast, black and white photograph of the glasses on a trade show booth backdrop prior to March 26, 1980.

■ "The essence of 'public use' is the free and unrestricted giving over of an invention to a member of the public or the public in general." *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1265 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 875, 93 L.Ed.2d 829 (1987) (citing with approval *Moleculon Research Corp. v. CBS, Inc.*, 594 F.Supp. 1420, 1427 (D.Del.1984)). The court must examine the totality of the circumstances to determine whether a public use within the meaning of section 102(b) occurred. *Id.* at 1266. Although plaintiffs admit displaying a high-contrast photograph of the Gargoyles eyewear prior to the critical date, defendant has not established that the utilitarian features of the eyeglasses were disclosed on or discernable from the backdrop. The court finds that defendant has not established by clear and convincing evidence that there was a public use of the claimed invention prior to the critical date within the meaning of 35 U.S.C. § 102(b).

■ To establish that the invention was on sale under 35 U.S.C. § 102(b) and thus invalidate the utility patent, the defendant must sustain a very heavy burden of proof. *Kornylak Corp.*, 207 U.S.P.Q. at 159. "[W]here there is no sale, a definite offer to sell is an essential requirement of the on-sale bar.... The requirement of a *definite* offer excludes merely indefinite or nebulous discussion about a possible sale." *RCA Corp. v. Data General Corp.*, 887 F.2d 1056, 1062 (Fed.Cir. 1989) (emphasis in original, citation omitted). Defendant has not established that plaintiffs' trade show activities, including an abortive

meeting for prospective Gargoyles sales representatives, violated the on-sale bar. The court finds that defendant has not established by clear and convincing evidence that the claimed invention was on sale prior to the critical date within the meaning of 35 U.S.C. § 102(b).

## C. Inventorship

■ Defendant argues that the '611 patent is invalid for improper inventorship under 35 U.S.C. § 102(f)[9] and 35 U.S.C. § 116.[10] Specifically, defendant asserts that the development of the Gargoyles optical design and the use of ultrasonic bonding to attach the nosepiece were inventive contributions by employees of Gentex who should have been named as joint inventors. The presumption of patent validity requires defendant to establish invalidity by proving joint-inventorship by clear and convincing evidence. *Hobbs v. United States Atomic Energy Comm'n*, 451 F.2d 849, 865 (5th Cir. 1971).

As to the optical design developed by John Davis, a consultant to Gentex, "[a]n inventor 'may use the services, ideas, and aid of others in the process of perfecting his invention without losing his right to a patent.'" *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613, 624 (Fed.Cir.), *cert. dismissed*, 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985) (citing *Hobbs*, 451 F.2d at 864). The parties introduced conflicting evidence as to whether the engineering work performed by Davis constituted an inventive contribution to Burns' eyewear concept or merely routine development of the Gargoyles eyeglasses. The court finds that defendant has not established by clear and convincing evidence that Davis contributed inventively to the claimed invention.

Ultrasonic bonding was utilized to attach the nosepiece to the Gargoyles eyeglasses

---

8. Because defendant has not established that Gargoyles eyeglasses and advertisements disclosing the utilitarian features thereof were displayed prior to the critical date, the court finds that Gargoyles eyewear and such advertisements are not pertinent prior art for purposes of the obviousness analysis outlined in section II(A), *supra*.

9. "A person shall be entitled to a patent unless ... he did not himself invent the subject matter sought to be patented." 35 U.S.C. § 102(f).

10. "When an invention is made by two or more persons jointly, they shall apply for patent jointly and each make the required oath." 35 U.S.C. § 116.

after the original method proved mechanically and cosmetically unacceptable to Pro-tec. Defendant alleges that the idea for utilizing ultrasonic bonding originated with an unnamed person or persons at Gentex; plaintiff asserts that Burns suggested the modification. In light of the conflicting evidence and that ultrasonic bonding was already being utilized to mount the temple pieces to the Gargoyles lenses, the court finds that defendant has not established by clear and convincing evidence that any person contributed inventively to the claimed invention by suggesting modification of the nosepiece attachment technique. Thus, the court finds that defendant failed to establish invalidity for improper inventorship.

## D. Best Mode

■ Under the best mode requirement: The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112.

In addition:

In interpreting § 112, the courts have emphasized the obligation of the inventor to disclose the best method contemplated by him to carry out the invention, as of the time he executes his application. On the other hand, the courts have not required the mode disclosed by the inventor be in fact the optimum mode of carrying out the invention. Even if there is a better method, the failure to disclose it will not invalidate the patent if the inventor does not know of it or does not appreciate that it is the best method. Instead, the thrust of the decisions in this area has been to require that the inventor act in good faith with no attempt to conceal what he feels is the best method of using the invention.

*Studiengesellschaft Kohle mbH v. Eastman Kodak Co.*, 616 F.2d 1315, 1339–40 (5th Cir.),

*cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980) (citations omitted).

Defendant argues that the utility patent fails to satisfy the best mode requirement by incorrectly stating that the lenses should have uniform thickness, incorrectly stating diopter values, and omitting lens design information such as lens power, lens thickness and location of optical centers.

A proper best mode analysis has two components. The first is whether, at the time the inventor filed his patent application, he knew of a mode of practicing his claimed invention that he considered to be better than any other.... If the inventor in fact contemplated such a preferred mode, the second part of the analysis compares what he knew with what he disclosed—is the disclosure adequate to enable one skilled in the art to practice the best mode or, in other words, has the inventor "concealed" his preferred mode from the "public"? Assessing the *adequacy* of the disclosure, as opposed to its *necessity*, is largely an objective inquiry that depends upon the scope of the claimed invention and the level of skill in the art.

*Chemcast Corp. v. Arco Industries Corp.*, 913 F.2d 923, 927–28 (Fed.Cir.1990) (emphasis in original).

The scope of the claimed invention covers eyeglasses with lenses "having toric inner and outer surfaces which have radii of curvatures that are selected to provide zero power." U.S. Patent No. 4,741,611, col. 4, l. 16–18. Lenses covered by the utility patent have a specific optical design. There is conflicting evidence regarding whether Burns knew the details of the optical design of the Gargoyles eyewear and appreciated it as the best mode of carrying out the claimed invention at the time he filed the patent application.

Plaintiffs admit two obvious mistakes exist in the '611 patent. The patent states the toric lenses "are of uniform thickness throughout and thus have zero power." U.S. Patent No. 4,741,611, col. 2, l. 67–68. Toric lenses with zero power cannot be of uniform thickness throughout. Although aware of this error, the patent examiner allowed the patent to issue. Also, the diopter value of

−4.7 for the vertical meridian should have been reported as −4.79. U.S. Patent No. 4,741,611, col. 3, l. 4. The disclosed diopter values cannot be utilized to produce a zero-power lens. Although a person of ordinary skill in the art would have recognized the errors in the lens design information, the court must consider the patentee's erroneous disclosures in applying *Chemcast*.

Defendant introduced evidence suggesting that a person of ordinary skill in the art could not practice the best mode. Plaintiffs introduced equally persuasive evidence suggesting that a person of ordinary skill could practice the best mode without undue experimentation. The court finds that the defendant failed to establish by clear and convincing evidence that Burns knew of and concealed a better mode of carrying out the claimed invention than that disclosed in the utility patent, and that the disclosure was inadequate to enable one skilled in the art to practice the best mode. Thus, the court finds that defendant has not established invalidity for violation of the best mode requirement.

### E. Inequitable Conduct

One must exercise the highest duty of candor when presenting a patent application before the PTO. *See Hycor Corp. v. Schlueter Co.*, 740 F.2d 1529, 1538 (Fed.Cir.1984).

> If one "fail[s] to disclose material information, or submit[s] ... false material information, with an intent to mislead, ... [and there is] a threshold degree of materiality of the nondisclosed or false information," then such conduct is deemed inequitable and all claims of the patent are unenforceable.

*Consolidated Aluminum Corp. v. Foseco Int'l Ltd.*, 716 F.Supp. 316, 323 (N.D.Ill. 1989), *aff'd*, 910 F.2d 804 (Fed.Cir.1990) (citing *J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1559 (Fed.Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985)). Defendant argues that Pro-tec and Burns acted inequitably by not disclosing the early 1980 trade show activities and by falsely characterizing the Gatten patent during the prosecution of the utility patent.

To be guilty of inequitable conduct, one must have intended to act inequitably. Thus, one who alleges a "failure to disclose" form of inequitable conduct must offer clear and convincing proof of: (1) prior art or information that is material; (2) knowledge chargeable to applicant of that prior art or information and of its materiality; and (3) failure of the applicant to disclose the art or information resulting from an intent to mislead the PTO.

*FMC Corp. v. Manitowoc Co., Inc.*, 835 F.2d 1411, 1415 (Fed.Cir.1987) (footnote omitted). The court must examine the totality of the circumstances to determine whether plaintiffs engaged in inequitable conduct. *Id.*

The court limits its analysis regarding Pro-tec's promotional activities to display of the backdrop at trade shows prior to the critical date because defendant has not established that Gargoyles eyewear or advertisements disclosing the utilitarian features were displayed at those trade shows. Although display of the backdrop and attendance at trade shows prior to the critical date are arguably material to the issuance of the '611 patent, defendant has failed to establish that plaintiffs are chargeable with knowledge of that materiality or intent to deceive the PTO.

As discussed in section II(A), *supra*, the teachings of the Gatten patent are unclear. That patent is susceptible to multiple interpretations as a result of language defendant's expert characterized as "unfortunate." Tr. at 794, l. 5–11. Defendant has not established that plaintiffs' interpretation of the Gatten patent was erroneous, that plaintiffs are chargeable with knowledge that their interpretation of Gatten was erroneous, or that plaintiffs intended to deceive the PTO by mischaracterizing the teachings of Gatten. The fact that plaintiffs attempted to distinguish the claimed invention from prior art does not constitute a material omission or misrepresentation where the patent examiner was free to reach his own conclusion regarding the claimed invention on the art before him. *Akzo N.V. v. International Trade Comm'n*, 808 F.2d 1471, 1482 (Fed. Cir.1986), *cert. denied*, 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987). The court finds that defendant failed to establish by

clear and convincing evidence that the utility patent is invalid as a result of inequitable conduct by plaintiffs.

## CONCLUSION

The court finds the accused device literally infringes claim 1 of the utility patent and infringes claim 8 of the utility patent under the doctrine of equivalents. The court also finds that defendant has failed to establish by clear and convincing evidence that the utility patent is invalid. Therefore, defendant is liable to plaintiffs for infringement of the '611 patent pursuant to 28 U.S.C. § 1498(a). Damages shall be determined in a future proceeding.