*524
 
 INTRODUCTION and BACKGROUND
 

 WALLS, District Judge.
 

 Plaintiff Bristol-Myers Squibb Company (“Bristol”) moves for summary judgment that U.S. Patent Nos. 5,641,803 (“the ’803 patent”) and 5,670,537 (“the ’537 patent”) are not unenforceable due to inequitable conduct. Defendants and counterclaim-ants, Zenith Goldline Pharmaceuticals, Inc., IVAX Corporation, Baker Norton Pharmaceuticals, Inc., and Immunex Corporation (collectively “IVAX”) oppose this motion. Defendants Mylan, Schein and Marsam join and adopt IVAX’s arguments. So too defendants Ben Venue Laboratories, Inc. and Bedford Laboratories (together “Ben Venue”), who also separately oppose the motion.
 

 Bristol has asserted its ’803 and ’537 patents against each defendant. Although U.S. Patent No. 5,621,001 (“the ’001 patent”), has not been asserted against any defendant, its prosecution history is relevant. Each of these three patents descended from the same “grandparent,” U.S. Patent application Serial No. 07/923,-628 (“the ’628 application”), filed August 3, 1992. During the five-year prosecution history, Bristol filed numerous divisional applications, amended and deleted claims, sometimes pursuant to restriction requirements mandated by the patent examiner.
 
 See
 
 chart, Bristol Motion I, Exh. C. Ultimately, the ’803 and ’537 patents issued from- continuation applications descended from “parent” application 08/109,331 (“the ’331 application”). In contrast, the ’001 patent issued from continuation applications of the ’404 application, located in a separate chain from the ’331 application.
 

 The Ben Venue defendants allege the following: Pursuant to a 1991 Cooperative Research and Development Agreement (“CRADA”) between Bristol and the National Cancer Institute (“NCI”), Bristol obtained exclusive rights to all of NCI’s development work with taxol. Using that work, in July 1992, Bristol filed a New Drug Application (“NDA”) with the FDA for approval to market taxol in the United States. In December 1992, the FDA approved Bristol’s NDA, and pursuant to the Hatch-Waxman Act, Bristol received five years of marketing exclusivity.
 

 These defendants allege that in order to maintain its monopoly, despite representations to Congress that taxol was not patentable, Bristol filed its first patent application in August 1992. They describe the financial incentives: “A Bristol patent could be listed in the FDA’s Orange Book, with the consequence that potential generic competitors would have to challenge Bristol’s patents before they could obtain approval from FDA to market their generic drugs. Under the Hatch-Waxman Act, any such patent challenge results in an automatic 30 month delay of generic approvals, unless the litigation is terminated
 
 *525
 
 earlier.” Ben Venue Br. at 2-3; 21 U.S.C. § 355(j)(5)(B)(iii). Over the ensuing years, defendants assert, various patent claims submitted by Bristol were rejected as anticipated or rendered obvious by prior art references. Finally, between April and September 1997, immediately before Bristol’s Hatch-Waxman exclusivity was to expire, the patent examiner allowed four separate patents concerning taxol to Bristol as assignee.
 

 The defendants accuse Bristol of inequitable conduct at two stages: during the prosecution of the ’803 and ’537 patents; and during the prosecution of the non-asserted ’001 patent, under a theory of “infectious unenforceability.”
 

 Bristol has filed two pending motions. In the present motion, which Bristol calls “Bristol Motion II,” the plaintiff moves for summary judgment of no inequitable conduct. And by “Bristol Motion I,” Bristol moves for summary judgment on defendants’ remaining
 
 Walker Process
 
 counterclaims. Arguments and exhibits from that motion are incorporated herein by reference.
 

 DISCUSSION
 

 1.
 
 Summary Judgment Standard
 

 Summary judgment is appropriate where the moving parties establish that “there is no genuine issue as to any material fact and that [they are] entitled to a judgment as a matter of law.” Fed.R.Civ.P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material.
 
 See Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit.
 
 See Anderson,
 
 477 U.S. at 248, 106 S.Ct. 2505. The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof.
 
 See Celotex v. Catrett,
 
 477 U.S. 317, 318, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
 

 Once the moving party has carried its burden under Rule 56, the opposing parties “must do more than simply show that there is some metaphysical doubt as to the material facts in question.”
 
 Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
 
 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). They must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of their pleadings.
 
 See Sound Ship Building Corp. v. Bethlehem Steel Co.,
 
 533 F.2d 96, 99 (3rd Cir.1976),
 
 cert. denied,
 
 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976). At the summary judgment stage the court’s function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.
 
 See Anderson, 477
 
 U.S. at 249, 106 S.Ct. 2505. In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving parties.
 
 See Wahl v. Rexnord, Inc.
 
 624 F.2d 1169, 1181 (3rd Cir.1980). Summary judgment is as appropriate in a patent case as in any other.
 
 See, e.g., Desper Products, Inc. v. QSound Labs, Inc.,
 
 157 F.3d 1325, 1332 (Fed.Cir.1998).
 

 Thus, the “proper inquiry ... is ‘whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.’ ”
 
 Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc.,
 
 984 F.2d 1182, 1185 (Fed.Cir.1993) (citation omitted). “[Sjummary judgment is authorized when it is quite clear what the truth is.”
 
 Id.
 

 2. Inequitable Conduct Standard
 

 A patent applicant has a duty to prosecute applications before the Patent and Trademark Office (PTO) with candor, good faith and honesty.
 
 Molins PLC v. Textron, Inc.,
 
 48 F.3d 1172, 1178 (Fed.Cir.
 
 *526
 
 1995). Inequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information or submission of false material information, coupled with an intent to deceive.
 
 Id.
 
 In this regard, the knowledge and actions of an applicant’s representatives are chargeable to the applicant.
 
 FMC Corp. v. Manitowoc Co.,
 
 835 F.2d 1411, 1415 n. 8 (Fed.Cir.1987).
 

 The determination of inequitable conduct is committed to the court’s discretion.
 
 Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,
 
 120 F.3d 1253, 1255 (Fed.Cir.1997). To prevail, a defendant must produce clear and convincing evidence of both materiality and intent to deceive.
 
 Kingsdown Med. Cons., Ltd. v. Hollister,
 
 863 F.2d 867, 872 (Fed.Cir.1988). Once threshold findings of materiality and intent are made, the court must weigh them together to determine whether a conclusion of inequitable conduct is warranted.
 
 Halliburton Co. v. Schlumberger Tech. Corp.,
 
 925 F.2d 1435, 1439 n. 3 (Fed. Cir.1991). The more material the omission or misrepresentation, the less intent that must be shown to reach a conclusion of inequitable conduct, and vice versa.
 
 Akzo N.V. v. U.S. Int’l Trade Comm’n,
 
 808 F.2d 1471, 1481-82 (Fed.Cir.1986). Close cases should not be resolved unilaterally by the applicant, but rather through disclosure to the PTO.
 
 LaBounty Mfg., Inc. v. U.S. Int’l Trade Comm’n,
 
 958 F.2d 1066, 1076. (Fed.Cir.1992).
 

 “The starting point in determining materiality is the definition of the PTO.”
 
 Critikon,
 
 120 F.3d at 1257. PTO Rule 56 provides that “information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and ... [i]t establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or ... [i]t refutes, or is inconsistent with, a position the applicant takes in: ... [o]pposing an argument of unpatentability relied on by the Office, or [ajsserting an argument of patentability.” 37 C.F.R. § 1.56 (1999). The standard is not whether the particular examiner of the application at issue considered a reference important; rather, the appropriate inquiry focuses on a “reasonable examiner.”
 
 Molins,
 
 48 F.3d at 1179. Finally, a reference is not immaterial simply because claims are ultimately patented thereover.
 
 Id.
 

 In turn, because direct evidence of intent to deceive is rarely available, the intent element may be inferred from the surrounding circumstances.
 
 J.P. Stevens & Co. v. Lex Tex, Ltd.,
 
 747 F.2d 1553, 1559 (Fed.Cir.1984). Thus, “smoking gun” evidence is not required in order to establish an intent to deceive.
 
 Paragon,
 
 984 F.2d at 1189-90. An inference of intent is warranted where a patent applicant knew or should have known that the withheld information would be material to the PTO’s consideration of the patent application.
 
 Critikon,
 
 120 F.3d at 1256. “In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material reference.”
 
 Molins,
 
 48 F.3d at 1181.
 

 3.
 
 Whether A Triable Issue Exists As To Bristol’s Inequitable Conduct in Prosecuting the ’537 and ’80S Patents
 

 Bristol claims that the record evidence shows that its representatives, particularly patent counsel, provided “the most pertinent prior art” to the patent examiner during prosecution of the two patents at issue. For this motion, the plaintiff considers only the 14 material misrepresentations alleged by defendants in their Expert Reports of December 2, 1999.
 
 See
 
 Bristol Br. at 18. Bristol claims that thirteen of these alleged misrepresentations relate to characterizations by patent counsel or inventor Renzo Canetta of five prior art references authored by Longnecker et al., Donehower et al., Kris et al., Wiernik et al., and Weiss et al.
 
 Id.
 
 The patentee further claims that counsel provided these
 
 *527
 
 five references to the patent examiner, who acknowledged that he read and considered each document.
 
 See
 
 Bristol Statement of Material Facts ¶¶ 14, 23, 27, 44, 52, 57 (asserting that Kris et al. and other unspecified references were disclosed on various Information Disclosure Statements (“IDS”)). Absent proof to the contrary, the court presumes that the examiner did consider the cited references.
 
 Molins,
 
 48 F.3d at 1184.
 

 The crux of Bristol’s argument is that it delivered all material prior art as required to the patent examiner. And that, under Federal Circuit precedent, it was then free to advocate for the patentability of its inventions over the disclosed references.
 
 See Akzo N.V. v. U.S. Int’l Trade Comm’n,
 
 808 F.2d 1471, 1482 (Fed.Cir.1986).
 

 The defendants, both IVAX and Ben Venue, challenge that conclusion.
 

 A.
 
 References Withheld from the PTO
 

 i. The O’Connell Abstract
 

 Initially, the IVAX defendants claim that Bristol acted inequitably by failing to disclose the O’Connell reference, which reported the results of a Phase I study where taxol had been administered over a 2-3 hour infusion period every three weeks. The reported dosage range began at 15 mg/m2 and rose to 230 mg/m2. O’Connell concluded: “[F]or doses up to 160 mg/m2 ... Taxol can be safely given as a 3 hour infusion every 3 weeks.”
 
 See
 
 O’Connell et al., “Phase I Trial of Taxol Given as a Three Hour Infusion Every Three Weeks,” 26 Proceedings of AACR, 169(671) (1985), Holland Decl. Exh. C. IVAX charges that this reference is significant because it reported administration of doses of 135 and 160 mg/m2, which fall within the range of doses claimed in the patents at issue, to be safe.
 

 Bristol, in its other motion for summary judgment (“Bristol Motion I”), claims that the O’Connell reference is not material because it is cumulative to the Kris et al. study.
 
 Id.
 
 at 30. The Kris study was cited as prior art in the 537 patent and referenced in the ’803 patent.
 
 See
 
 Bristol Statement of Material Facts in Supp. of Bristol Motion I ¶ 127; Haas Decl. Exh. 3 (’537 patent); Exh. 2, cols. 1-2 (’803 patent). The plaintiff characterizes O’Connell as a “preliminary summary” of the Kris study, which IVAX does not dispute.
 

 Bristol relies upon the Federal Circuit’s affirmance of a district court’s grant of partial summary judgment of no inequitable conduct where an applicant failed to submit a brief abstract of a study, but disclosed both the “complete” study itself and submitted several other references which cited the abstract.
 
 See Scripps Clinic & Research Found, v. Genentech, Inc.,
 
 927 F.2d 1565 (Fed.Cir.1991). And, the Federal Circuit again in
 
 Regents of the University of California v. Eli Lilly & Co.,
 
 119 F.3d 1559, 1575 (Fed.Cir.1997), held that the withholding of a prior art reference which described “essentially the same” work as that described in two disclosed articles could not support a finding of inequitable conduct. “[A] patentee has no obligation to disclose an otherwise material reference if the reference is cumulative or less material than those already before the examiner.”
 
 Halliburton Co. v. Schlumberger Technology Corp.,
 
 925 F.2d 1435, 1440 (Fed.Cir.1991).
 

 Nonetheless, IVAX argues that Bristol should have disclosed the O’Connell reference for two reasons. First, these defendants allege that Bristol “mercilessly attacked” the Kris et al. study during prosecution of the patents-in-suit, and characterized the 3-hour dosing regimen taught by Kris as “unduly hazardous.”
 
 See
 
 Declaration of Renzo Canetta Pursuant to 37 CFR § 1.132 in Support of ’594 Application, Mentlik Sec. Suppl. Decl. Exh. J at 469 (“In my opinion, one of ordinary skill in the art would conclude, based upon the Kris et al. reference, that a 3-hour duration of infusion for the administration of paclitaxel would be unduly hazardous. Moreover, since Kris et al. observed no antitumor activity, virtually
 
 *528
 
 any toxicity manifestation would invalidate the treatment regimen used by Kris et al.”). To the contrary, according.to IVAX, the O’Connell reference by reporting that the regimen was safe refuted Bristol’s argument to PTO.
 

 The court takes the defendants’ point. The decisions relied upon by Bristol relieve a patent applicant of the need to disclose an abstract or summary which reaches the same conclusions as a more complete study, when the latter is disclosed to the PTO. They should not be read to extend to circumstances, as here, where the author of an abstract had reached conclusions antinomic to those of the patent applicant. The IVAX defendants have made a colorable showing that the O’Connell abstract “refutes,” or is at least “inconsistent with,” Bristol’s position before the PTO, and should have been disclosed.
 
 See
 
 37 C.F.R. § 1.56 (1999).
 

 Furthér, a fact finder may infer deceptive intent when a patent applicant withholds potentially pertinent information and makes arguments for patentability which could not have been made had the information been disclosed.
 
 LaBounty,
 
 958 F.2d at 1076. At best, Bristol’s argument that Dr. O’Connell’s conclusions were “undermined” by later events in connection with the Kris study raises an issue of material fact whether the O’Connell reference was still material by 1992. Bristol was not free to unilaterally decide that the reference was immaterial.
 
 Id.
 
 at 1076.
 

 The court concludes that the IVAX defendants have raised a genuine, triable issue concerning the materiality of this reference. To the extent the defendants’ allegations of inequitable conduct rest on nondisclosure of the O’Connell abstract, Bristol’s motion for summary judgment is denied.
 

 Because of this disposition, the court does not now need to consider IVAX’s argument that Bristol was additionally required to disclose tiie citation of the O’Connell article as prior art in a 1994 proceeding against Bristol’s corresponding Australian patent.
 
 See
 
 Mentlik Third Suppl. Decl. Exh. W (Statement of Claim and Particulars of Grounds of Invalidity of Bristol’s Australian Taxol Patents, referring to both Kris and O’Connell).
 

 ii. April 1991 Clinical Trials Group Abstract (“OV.9 Abstract”)
 

 IVAX also seeks a triable issue of inequitable conduct from the distribution of a document at a meeting of the National Cancer Institute of Canada in April 1991 (“the OV.9 Abstract”), which Bristol did not disclose to the patent examiner.
 
 See
 
 Mentlik Sec. Suppl. Decl. Exh. S. The one-page abstract describes the protocol for Bristol’s OV.9 study of “the efficacy and safety of the investigational agent taxol in the treatment of platinum refractory epithelial ovarian carcinoma.” At the time of the April 1991 conference, it appears that the OV.9 study had not yet begun: “Trial activation is anticipated to be April/ May 1991.” No study results were given.
 

 The IVAX defendants assert that the OV.9 abstract is highly material because it “provides a link” between a study by McGuire et al. (treating ovarian cancer but without a 3-hour regimen) and Kris et al. (using a 3-hour regimen but not to treat ovarian cancer). As they have argued in their motion for partial summary judgment of anticipation and obviousness, the IVAX parties claim that the abstract is a complete anticipation of all claims of the ’803 and ’537 patents because it explicitly discloses the administration of taxol by infusion to treat ovarian cancer at dosages of 135 mg/m2 and 175 mg/m2 over three hours. And so, under PTO Rule 56, the defendants argue, the document is material because it establishes a prima facie case of unpatentability.
 

 Bristol responds that the abstract “does not constitute prior art under 35 U.S.C. § 102(b), let alone material prior art under 37 C.F.R. § 1.56.” Bristol Reply Br. at 9. Specifically, plaintiff claims that the document was not prior art because it was “intended to be confidential,” and because
 
 *529
 
 it lacks “utility” pursuant to 35 U.S.C. § 112, ¶ 1. Bristol Br. in Supp. of Mot. I at 31-32.
 

 The court has reserved judgment as to whether the OV.9 abstract was a “printed publication,”
 
 see
 
 35 U.S.C. § 102(b), capable of invalidating the patents.
 
 See Bristol-Myers Squibb v. Boehringer Ingelheim, et al.
 
 (“Anticipation/Obviousness Opinion”), 86 F.Supp.2d 433, 443-45 (D.N.J.2000). Yet, as defined by the Federal Circuit, information is material if it helps to establish a prima facie case of unpatentability
 
 or
 
 if it refutes or is inconsistent with the applicant’s positions before the PTO.
 
 See, e.g., Critikon,
 
 120 F.3d at 1257. Bristol apparently confuses the legal standards: an undisclosed reference need not constitute prior art to be “material” to the inequitable conduct inquiry.
 
 Id.
 
 at 1258 (finding inequitable conduct where patent applicant failed to disclose ongoing litigation concerning patent during reissue proceedings before the PTO; stating: “A patent applicant’s duty to disclose is not limited to disclosing prior art. A patent applicant must disclose any material information to the PTO.”);
 
 General Electro Music Corp. v. Samick Music Corp.,
 
 19 F.3d 1405 (Fed.Cir.1994) (affirming a finding of inequitable conduct based on false affidavit by patent attorney that he had conducted a careful search of the prior art; holding that intentional and material false statement to the PTO renders patent unenforceable);
 
 Merck & Co., Inc. v. Danbury Pharmacal, Inc.,
 
 873 F.2d 1418, 1421 (Fed.Cir.1989) (rejecting patentee’s argument that reference was immaterial because it did not render the claimed invention obvious: “Merck wrongly supposes a ‘but for’ standard of materiality.... That the claimed invention may have been superior in one property to both the cited and withheld prior art may be a basis for patentability; it cannot serve automatically to render the withheld prior art either cumulative or immaterial.”).
 

 Accordingly, the court need not inquire whether the ’803 and ’537 inventions could have been patented over the withheld OV.9 abstract.
 
 Merck,
 
 873 F.2d at 1421. Instead, the proper question at this time is whether a reasonable examiner would have considered the reference important in the decision to allow the ’803 and ’537 patents to issue. “The matter misrepresented need only be within a reasonable examiner’s realm of consideration.”
 
 Id.
 
 at 1421.
 

 The court has not yet determined whether the challenged reference anticipates or renders obvious the patents in suit. However, the defendants have made a showing that the reference is material: The court has determined that the ’803 patent claims describe an invention to treat cancer through the parenteral (intravenous) administration of taxol: 1) at a dosage of between 135 and 175 mg/m2, 2) over a period of about three hours.
 
 See Bristol-Myers Squibb v. Immunex et al.
 
 (“Markman” Opinion), 86 F.Supp.2d at 451-53 (D.N.J.2000). In turn, the ’537 claims describe a method to: 1) premedicate a patient with a medicament that reduces or eliminates hypersensitivity reactions, and 2) parenterally administer 135-175 mg/m2 over about three hours.
 
 Id.
 
 86 F.Supp.2d at 454. It is apparent that the defendants have factually disputed the materiality of the OV.9 abstract to the patents in suit. The ultimate legal effect of Bristol’s nondisclosure of the document will be determined at trial.
 

 Regarding intent, 1VAX claims that “Bristol was strongly motivated to seek any possible patent protection as part of its overall anti-generic strategy,” and refers the court to documentation that Bristol’s primary strategy to beat generic competition was to secure patents on Taxol. IVAX Br. at 38; Mentlik Third Suppl. Decl. Exhs. EE (“Taxol Worldwide Product Strategy Document”) and FF. This showing, together with IVAX’s submission of declarations of conference attendees that Dr. Elizabeth Eisenhauer, a named
 
 *530
 
 inventor of the patents in suit, was aware of the OV.9 Abstract and discussed the study at the conference, provides a threshold inference of Bristol’s intent to mislead the PTO sufficient to defeat summary judgment.
 
 See
 
 Declarations of Robert Pearcey and Marc Trudeau. The good faith attestations of Dr. Canetta and Bristol’s patent counsel Brian O’Shaughnessy do not void this conclusion.
 
 See
 
 Marriott Decl. in Supp. of Bristol Mot. I Exhs. 90 and 91;
 
 FMC Corp. v. Manitowoc Co., Inc.,
 
 885 F.2d 1411, 1416 (Fed.Cir.1987).
 

 To the extent that it seeks to eliminate defendants’ contentions of inequitable conduct based upon nondisclosure of the OV.9 Abstract, Bristol’s motion for summary judgment is denied.
 

 iii. The OV.9 Protocol
 

 Ben Venue refers to evidence that Bristol suppressed documentation before the PTO inconsistent with its prosecution position that there was no evidence that taxol had antitumor effects when administered over an infusion schedule of less than 6 hours. To provide context, Ben Venue references the Supplemental Declaration of Dr. Canetta pursuant to 37 C.F.R. § 1.132, submitted to the PTO during prosecution of the ’803 and ’537 patents in June and September 1996, respectively:
 

 I am now thoroughly familiar with the literature in the art related to the use of taxol ... in the treatment of patients suffering from cancer. I have carefully studied the references that I am aware of that are relevant to this patent application ... The Longnecker reference contributes nothing relevant to the art that is not taught by Kris et al. or Donehower et al. and addressed in my earlier Declaration. Indeed, Longnecker is consistent with these references
 
 in that they all teach that short duration (i.e. <6 hrs) Taxol infusion protocols are ineffective in that they produce no observable tumor regression, and that they are unduly hazardous.
 

 Alper Decl. Exh. F ¶¶ 5, 15 (emphasis added). Ben Venue also refers to an amendment filed with the Supplemental Canetta Declaration:
 

 Dr. Canetta’s earlier filed Declaration and his Supplemental Declaration establish that the art taught that Taxol infusion durations of less than six hours were unduly toxic
 
 and produced no observable tumor regression.
 

 Alper Decl. Exh. G at 5 (emphasis added).
 

 Against this background, Ben Venue argues that Bristol was required to, but did not, disclose the protocol for its OV.9 study of taxol treatment of ovarian cancer patients (“the OV.9 protocol”), a 59-page document which provides substantially more detail than the OV.9 Abstract discussed earlier. ■ The principal authors of the protocol were Drs. Canetta and Eisen-hauer. Ben Venue claims that the protocol, submitted to the ethics review boards of participating institutions for approval, included data from earlier studies of taxol in direct conflict with Bristol’s statements to the PTO. Ben Venue excerpts the following: “No phase II data exists on the efficacy of the drug when administered on a shorter infusion. However,
 
 significant tumor shrinkage was observed in Phase I trials of taxol using 1 to 6 hour infusions.”
 
 OV.9 Protocol, Alper Decl.'Exh. D at 33 (emphasis added).
 

 When questioned about this sentence, Dr. Eisenhauer testified:
 

 Q: .... And, in fact, this was being provided as a rationale for why the three hour was reasonable?
 

 A: This was being provided as evidence that the drug seemed to be effective in that it could cause tumour regression even though we hadn’t done a formal phase two evaluation, which is the trial that tends to be the one associated with the formal assessment of efficacy ... So there was no reason not to expect short infusions to be active.
 

 Alper Decl. Exh. I at 76. Finally, Ben Venue refers to a sentence in the protocol: “Given prior results and the patient selec
 
 *531
 
 tion for this trial, an objective response rate of 35% can be expected.” Alper Decl. Exh. D at 34.
 

 So Ben Venue declares that the OV.9 protocol and Eisenhauer’s deposition testimony flatly contradict Bristol’s PTO assertion that there was no “observable tumor regression” in the prior art when taxol was administered over less than 6 hours.
 

 Bristol counters that the referenced Phase I studies demonstrated antitumor response only at a 6-hour infusion regimen; the thrust of its argument being that the statement was not materially misleading.
 
 See
 
 Bristol Reply Br. at 16. The materiality of the OV.9 protocol is evidently disputed. And there is no evidence that the underlying studies, notably not identified by the parties, were ever disclosed to the PTO.
 
 Cf. Akzo N.V. v. U.S. Int’l Trade Comm’n,
 
 808 F.2d 1471 (Fed.Cir.1986).
 

 The court last considers whether the defendants have made a showing that Bristol intended to mislead the PTO. Here, Bristol does not challenge that it was aware of its own protocol; this situation is distinguishable from those where a paten-tee inadvertently omits a prior art reference authored by a distant competitor. Bristol’s unsupported arguments in its reply brief do not adequately explain the conflicting language in the OV.9 protocol.
 
 See
 
 Bristol Reply Br. at 17 (“Ben Venue ... [concocts] an argument that Bristol engaged in inequitable conduct by stating in the OV.9 protocol that ‘significant tumor shrinkage was observed in phase I trials using 1 to 6 hour infusions.’ Here again, Ben Venue misleads; the
 
 study
 
 used both 1 and 6 hours, but antitumor activity was observed only in the 6 hour infusion schedules.”). Again, at this time, Bristol’s denials of bad faith by the declarations of Dr. Canetta and patent counsel O’Shaughnessy are insufficient to prevail over the alleged contradictions of the OV.9 protocol and Eisenhauer testimony.
 

 The court denies summary judgment to Bristol to the extent that the defendants’ allegations of inequitable conduct are based on nondisclosure of the OV.9 protocol.
 

 B.
 
 Alleged Mischaracterizations and Omissions Concerning the Disclosed Prior Art
 

 Defendants charge that Bristol omitted material references and made a number of inconsistent statements during its patent prosecution: They allege that Bristol committed inequitable conduct by “denigrating” studies by McGuire and Kris before the PTO, while withholding laudatory information about those trials.
 
 See
 
 McGuire et al., “Taxol: A Unique Antineoplastic Agent With Significant Activity In Advanced Ovarian Epithelial Neoplasms,” 111 Annals of Internal Medicine 273 (1989) (“McGuire”),
 
 see
 
 Holland Decl. Exh. D, and Kris et al., “Phase I Trial of Taxol Given as a 3-hour Infusion Every 21 Days,” 70 Cancer Treatment Reports 605 (1986) (“Kris”),
 
 see
 
 Holland Decl. Exh. B. It is undisputed that the McGuire and Kris studies themselves were disclosed by Bristol with the “grandparent” ’628 application.
 
 See
 
 Bristol Statement of Material Facts Hit 15, 16; IVAX Statement of Material Facts ¶¶ 15, 16. But defendants charge that Bristol made statements to the PTO about McGuire and Kris, directly contradicted by undisclosed studies and reports it relied on to secure FDA approval to market taxol.
 

 Bristol disputes the legal effect of these alleged mischaracterizations and seeks haven in
 
 Akzo N.V. v. U.S. Int’l Trade Comm’n,
 
 808 F.2d 1471 (Fed.Cir.1986). There the Federal Circuit found no inequitable conduct when a patent applicant argued and submitted affidavits to distinguish disclosed prior art from its claimed invention. The Court found that the applicant’s advocacy of a particular, albeit favorable, interpretation of disclosed prior art satisfied neither the materiality nor the intent prong of the inequitable conduct standard because “[t]he examiner was free to reach his own conclusion regarding [the
 
 *532
 
 claimed process] based on the art in front of him.”
 
 Id.
 
 at 1482.
 

 The Court of Federal Claims later cited
 
 Akzo
 
 to hold that inequitable conduct charges based on alleged “false characterizations” of an earlier patent could not stand, when the earlier patent was susceptible to multiple interpretations — at least when there was no showing that the patent applicants were “chargeable with knowledge” that their interpretation of the patent was erroneous, nor that they intended to deceive the PTO.
 
 Gargoyles, Inc. v. U.S.,
 
 32 Fed. Cl. 157, 169 (Fed.Cl.1994). Bristol concludes that its representatives merely “advocated, as they were entitled to do,” for the patentability of the claimed inventions over prior art that it disclosed to the PTO.
 

 This court is not so sure. IVAX relies upon the unpublished decision of
 
 In re Rhone-Poulenc Rorer, Inc.,
 
 178 F.3d 1309, 1998 WL 879127 (Fed.Cir.1998), a battle over taxol rights between Bristol and its French competitor Rhone-Poulenc Rorer. Although that decision is not precedential, the Federal Circuit there reviewed a district court’s order to vitiate the attorney-client privilege because of a prima facie showing that the “crime-fraud” exception to the privilege was satisfied. The district court had noted that the patent applicant had not initially disclosed nor “pointed out the significance” of an article that the examiner found on his own and said:
 

 [The patentees] argue that the examiner found the JACS article on his own and, therefore, must have been aware of its content. There is no showing, however, that the examiner was aware of the content of the article and did not just note it because it was authored by the inventors and dealt with the same subject....
 
 Defendants had a duty to point out the statements in the JACS article which were contradictory to the statements in the patent and explain them.
 
 ... Not only did defendants fail in their duty to disclose the JACS article, they failed to point out the statements therein that raise serious issues about the operability of certain of the claims. Accordingly, there is a prima facie showing of fraud.
 

 Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.,
 
 1998 WL 474206 (S.D.N.Y. Aug.12, 1998) (emphasis added). In applying a clear error standard of review, the Federal Circuit found that the district court’s conclusions were sustainable and did not overturn its finding of prima facie fraud. 1998 WL 879127, at *2.
 

 The
 
 Rhone-Poulenc Rorer
 
 district court also referred to
 
 Rohm & Haas Co. v. Crystal Chemical Co.,
 
 722 F.2d 1556, 1571 (Fed.Cir.1983), which iterated that “a very important policy consideration is to discourage all manner of dishonest conduct in dealing with the PTO.” The
 
 Rohm & Haas
 
 court had faulted the patentee for its submission of affidavits which falsified data and failed to accurately represent the experimental conditions used in studies critical to the patent’s issuance.
 
 Id.
 
 at 1570-71 (“In contrast to cases where allegations of fraud are based on the withholding of prior art, there is no room to argue that the submission of false affidavits is not material.”). The court then held that such material misrepresentations were not cured by the patent applicant’s presentation to the patent examiner of “a mountain of largely irrelevant data from which he [was] presumed to have been able, with his expertise and with adequate time, to have found the critical data.”
 
 Id.
 
 at 1573. Under those circumstances, the Court characterized the district court’s conclusion that the patent examiner was “fully informed” of all material factors relevant to patentability as “unrealistic”.
 
 Id.
 

 This court appreciates these decisions quoted by PVAX as instructive of the reach of the
 
 Akzo
 
 and
 
 Gargoyles
 
 decisions. And the court finds that the latter decisions do not insulate the broad range' of representations claimed by Bristol from inequitable conduct scrutiny.
 
 See also Semiconductor Energy Laboratory Co., Ltd. v. Samsung Electronics Co., Ltd.,
 
 4 F.Supp.2d 477, 494 n. 36 (E.D.Va.1998) (“It is worth noting
 
 *533
 
 that advocacy before the PTO is appropriate. But, there is a line between legitimate advocacy in accordance with the duty of candor, and advocacy that the applicant surely knows has a propensity to mislead the examiner.”),
 
 recons, denied,
 
 24 F.Supp.2d 537, 542 (E.D.Va.1998),
 
 aff'd on other grounds,
 
 204 F.3d 1368 (Fed.Cir.2000).
 

 i. Bristol’s Statements and Omissions Concerning the McGuire Study
 

 This court has described the McGuire study in its companion Anticipation/Obviousness Opinion.
 
 See Bristol-Myers Squibb v. Boehringer Ingelheim et aL,
 
 2000 WL 236518 (D.N.J. March 2, 2000). Relevant to this motion, Dr. McGuire conducted a trial with 47 drug-refractory
 
 [1]
 
 ovarian cancer patients where he administered a 24-hour infusion of taxol at doses ranging from 250 mg/m2 to 110 mg/m2. The researcher reported that 30% (12 patients) responded to taxol either partially or completely, including 6 of 25 patients refractory to the anti-cancer drug cisplatin.
 
 Id.
 
 at 275. His study further stated: “There appeared to be no correlation between the actual average dose of taxol and the likelihood for response.” McGuire Study at 276.
 

 Both the IVAX and Ben Venue defendants object to alleged misstatements by Bristol about the McGuire study. Bristol, they charge, represented to the PTO that: 1) none of the prior art taught that taxol was
 
 effective to
 
 treat ovarian cancer;
 
 [2]
 
 2) Bristol achieved higher objective response rates in its OV.9 study, particularly with refractory patients, than the prior
 
 art;
 

 [3]
 

 3)
 
 “conventional wisdom” at the time of Bristol’s invention
 
 required
 
 that high doses of over 200 mg/m2 be used to achieve anticancer effects;
 
 [4]
 
 and 4) the McGuire study itself “predicted that even higher doses of taxol (> 250 mg/m2) would be required to achieve the desired response,” and reported
 
 “no dose
 
 response relationship at all, and, presumably, no efficacy.” Mentlik Third Suppl. Decl. Exh. X at 564, 582.
 
 [5]
 

 
 *534
 
 Defendants also complain that Bristol acted inequitably by withholding four articles co-authored by the inventors of the patents in suit, which praised McGuire’s results, yet “completely contradicted” Bristol’s positions before the PTO.
 
 [6]
 
 Further, they challenge Bristol’s failure to disclose its own June 1992 “Final Study Report” on the McGuire trial, which, they allege, contained Bristol’s “true understanding” of McGuire.
 
 See
 
 IVAX Br. at 17; Mentlik Sec. Suppl. Decl. Exh. N; Mentlik Third Suppl. Decl. Exh. CC. In part, that report, which Bristol submitted to the FDA to support its successful efforts to obtain the agency’s approval, found:
 

 This phase II study was the first disease-oriented trial with taxol in patients with advanced ovarian carcinoma and clearly established the antineoplastic activity of taxol in this clinical setting with a response rate of 22%. In addition, it was also the first study to document that taxol was active after platinum failure, even in patients completely refractory or relapsing within 6 months of platinum discontinuation.
 

 # íK ❖
 

 First, it established that a new class of anti-neoplastic drugs, i.e., the taxanes had significant antineoplastic activity. Second, in regard to ovarian carcinoma, the response rate of 22% in a heavily pretreated population of patients clearly showed that taxol was an important new agent. Third, responses were observed even in patients completely refractory to platinum treatment.... $$$$$$
 

 Another interesting point was that these responses were documented at relatively low doses of taxol (135 mg/m2 and 175 mg/m2). These results suggest that treatment with taxol, even at low doses, can induce durable responses in patients with compromised hematopoiesis who cannot tolerate higher doses.
 

 Mentlik Sec. Suppl. Decl. Exh. N at 4, 126-27.
 

 The court finds that these allegations clearly meet the thresholds of materiality and intent. About materiality, the defendants have raised a triable issue that Bristol’s affirmative statements to the PTO do not comport with the actual findings of the McGuire study. More important to this court is its determination that Bristol’s characterizations of the McGuire study were profoundly inconsistent. There can be no question, after comparison of the above statements, that Bristol took one position before the PTO, and another before the FDA. Such is prohibited under the materiality standard of PTO Rule 56. Although the court finds it unnecessary now to separately address each characterization and omission, it rejects as a matter of law Bristol’s protest that virtually any statement about a disclosed reference should be deemed “mere advocacy” and irrelevant to the inequitable conduct inquiry.
 

 Regarding deceptive intent, the court is persuaded by defendants’ references to deposition testimony that highlights Bristol’s varying positions. At one point, Dr. Can-etta testified that the McGuire study demonstrated efficacy, yet he was compelled to concede that Bristol had asserted, without qualification, that taxol had not previously been known to be clinically effective. Mentlik Third Suppl. Decl. Exh. Y at
 
 *535
 
 807-808. And Bristol’s patent prosecutor admitted that “there is probably a reasonable chance” that statements in an undisclosed reference were inconsistent with statements he “may have made” to the PTO. Mentlik Third Suppl. Decl. Exh. CC at 126. The court readily concludes that the defendants have raised a material dispute as to whether Bristol intended to mislead the patent office.
 

 Bristol’s motion is denied to the extent that defendants’ charges of inequitable conduct rest on Bristol’s characterizations of the McGuire study, its nondisclosure of four studies co-authored by the inventors of the patents in suit and its Final Study Report addressing McGuire.
 

 ii. Bristol’s Statements and Omissions Concerning the Kris Study
 

 The court has also described the Kris study in its Antieipation/Obviousness Opinion.
 
 See Bristol-Myers Squibb v. Boehringer Ingelheim et al.,
 
 2000 WL 236518 (D.N.J. March 2, 2000). That study was a phase I trial, the goal of which was to determine a maximum tolerated dose for the drug. Holland Deck Exh. B. “This means that the drug must be administered to the point at which, because of toxicity and risk to the patient, it is not feasible to administer more of the drug. Efficacy is not expected ... [and] is relatively infrequent.” Holland Deck H 5. Dr. Kris treated only 17 patients, for 3 hours at doses between 15 mg/m2 and 230 mg/ m2. The researchers noted a number of side effects, including leukopenia, thrombocytopenia, nausea and vomiting, alopecia, stomatitis, transient rashes, increase in serum triglyceride levels, and hypersensitivity reactions. The article concluded:
 

 Hypersensitivity reactions constitute a severe and unpredictable treatment-limiting toxicity for the present cremophor-containing formulation of taxol given on this schedule. Further studies are needed to see if pretreatment regimens, alternative schedules [footnote omitted], or a reformulated preparation will permit the safe administration of this compound.
 

 Kris Article at 607.
 

 The IVAX defendants challenge Bristol’s descriptions of Kris to the PTO. Some of the defendants’ objections focus on Bristol’s allegedly selective quotation of the Kris study. See,
 
 e.g.,
 
 ’803 Patent Specification, Mentlik Deck Exh. A, cols. 1-2 (“Kris et al. concluded that ‘with the severity and unpredictability of the hypersensitivity reactions, further usage of taxol is not indicated with this drug formulation on this [administration] schedule.’ ”). This court is not persuaded that the use of direct quotations, albeit selectively, constitutes material misrepresentation.
 
 See Akzo,
 
 808 F.2d at 1482.
 

 Again the key to defendants’ argument is the antinomy of Bristol’s positions. The IVAX defendants quote from a declaration that Dr. Canetta submitted to the PTO which denigrated the Kris study:
 

 In my opinion, one of ordinary skill in the art would conclude, based upon the Kris et al. reference, that a 3-hour duration of infusion for the administration of paclitaxel would be unduly hazardous.
 
 Moreover, since Kris et al. observed no antitumor activity, virtually any toxicity manifestation would invalidate the treatment regimen used by Kris et al. Accordingly, one of ordinary skill in the art would conclude, consistent with the conclusions expressed by the authors themselves, that further investigation of the short duration infusion regimen of the Kris et al. reference was not indicated.
 

 Mentlik Sec. Suppl. Deck Exh. J at 469 (emphasis added). In contrast, Bristol’s own June 1992 “Final Study Report” on the Kris trial, not disclosed to the PTO, concluded:
 

 Doses of taxol up to 760 mg¡m2 over 3 hours were well tolerated with no severe toxicity except for occasional, non-life threatening myelosuppression. ...
 
 The most significant toxic effect was hypersensitivity reaction, which was apparent
 
 *536
 
 ly, in this study, dose related or perhaps concentration dependent. A fatal hypersensitivity reaction caused the discontinuation of this phase I study. This event, and the experience of other investigators using taxol, led to the introduction of routine antihypersensitivity prophylaxis prior to taxol therapy.
 

 Mentlik Sec. Suppl. Decl. Exh. 0 at 28 (emphasis added). And Dr. Canetta affirmed the report’s conclusions at his deposition. Mentlik Third Suppl. Deck Exh. Y at 829.
 

 WAX argues that Bristol’s efforts before the PTO to distinguish its invention from the “unduly hazardous” Kris study were “at war” with the contention in its undisclosed Final Study Report that taxol was “well tolerated”. WAX Br. at 26. The court agrees that the defendants have produced sufficient evidence to proceed to trial on the materiality of Bristol’s conflicting characterizations of Kris.
 
 See
 
 37 C.F.R. § 1.56 (1999). Further, the court finds that the submission of potentially false affidavits by Dr. Canetta may raise an inference of intent to deceive.
 
 Rohm & Haas,
 
 722 F.2d at 1571 (“While direct proof of intent to mislead is normally absent, such submissions [of false affidavits] usually will support the conclusion that the affidavit in which they were contained was the chosen instrument of an intentional scheme to deceive the PTO.”)
 

 The court holds that, on balance, the defendants have raised genuine issues as to both the accuracy of Bristol’s statements about Kris and the potential deceptive intent underlying the patentee’s decision to not disclose its “Final Study Report” to the PTO. To the extent that defendants’ allegations of inequitable conduct rely on Bristol’s characterizations of and nondisclosures concerning the Kris study, summary judgment is denied.
 

 C.
 
 Bristol’s Statement Regarding the Elimination of Need for Premedi-cation
 

 Finally, the WAX defendants challenge as “complete fabrication” a Bristol statement on July 25, 1995 in response to an examiner’s action in the ’331 application:
 

 A particularly significant advantage of the present invention is that with the reduction in duration of infusion and dosage, both hematologic and neurotox-icity are reduced or eliminated. At the reduced dosages claimed herein, Applicants have virtually eliminated the need for premedication. Accordingly, the complications associated with Taxol administration when administered in combination with other active agents are diminished or eliminated by the present regimens. This is significant since the administration of other active agents increases the variables and makes it more difficult to create an accurate therapeutic profile for Taxol in such a regimen.
 

 Mentlik Deck Exh. B at 204. That statement was authored by Bristol’s patent counsel. Mentlik Suppl. Deck Exh. F at 88. The defendants proffer the deposition testimony of Drs. Rozencweig, Eisenhauer, and Canetta that neither the OY.9 study nor other studies support the proposition that taxol can safely be administered over a 3-hour infusion without premedication.
 
 See
 
 Mentlik Dec. Exh. C at 31; Exh. D at 117-18; Exh. E at 721. The WAX defendants assert that on the basis of the July 1995 statement, Bristol was able to obtain claims in the ’803 patent, which includes no liihitation requiring premedication. WAX Br. at 29.
 

 Bristol does not respond to the merits of defendants’ contentions of materiality. Instead, plaintiff asserts that the statement was not considered responsive by the patent examiner, and under the Manual of Patent Examining Procedure
 
 [7]
 
 (“MPEP”),
 
 *537
 
 the examiner was directed not to enter it into the record.
 
 See
 
 Mentlik Decl. Exh. B at 211; MPEP § 821.03 (“An amendment canceling all claims drawn to the elected invention and presenting only claims drawn to the non-elected invention should not be entered. Such an amendment is nonresponsive.”). “[T]herefore, there is no evidence that the Patent Examiner ever considered that statement.” Bristol Br. at 22. Bristol concludes that because the statement was never repeated, it cannot base a finding of inequitable conduct.
 

 The court agrees. Counsel for Bristol confirmed at oral argument that the statement in question was never repeated to the PTO. Under the MPEP provision, the IVAX defendants have failed to raise a triable issue of the materiality of this statement.
 

 To the extent that the defendants base their charges of inequitable conduct on Bristol’s written statement of July 25, 1995, the motion for summary judgment is granted in part.
 

 4.
 
 Infectious Unenforceability
 

 Bristol seeks to take certain alleged misstatements and omissions out of issue altogether by claiming that statements made only during prosecution of the non-asserted ’001 patent should not be considered in the assessment of inequitable conduct in prosecution of the ’537 and ’803 patents. Such statements and omissions include Bristol’s representations: about the objective response rates and efficacy of the prior art, including the McGuire study; the “conventional wisdom” that high doses of taxol were required to achieve anticancer effects, and the relative novelty of Bristol’s own study results; the ability of low-dose regimens to treat cancer without producing neurotoxicity (nerve damage); and Bristol’s representations to the FDA that the 24-hour protocol resulted in greater toxicity and/or reduced efficacy than the 3-hour protocol.
 
 See
 
 Bristol Br. at 17 n. 5; Haas Decl. Exh. 7 (Alleged Misrepresentations and Omissions), Statements 4-38 and 59-63.
 

 The IVAX and Ben Venue defendants proceed on a theory of “infectious unenforceability,” which the Federal Circuit reviewed in
 
 Consolidated Aluminum Corp. v. Foseco Intern. Ltd.,
 
 910 F.2d 804 (Fed.Cir.1990). There the Court applied the unclean hands doctrine of
 
 Keystone Driller Co. v. General Excavator Co.,
 
 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933) and
 
 Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,
 
 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945), to affirm that a finding of unenforceability of one patent rendered related patents equally unenforceable because of the patentee’s “broad pattern of inequitable conduct.” The Circuit required that an “immediate and necessary relation” be shown between the patentee’s inequitable conduct and enforcement of the related patents.
 
 Id.
 
 at 810, 65 S.Ct. 993 (quoting
 
 Keystone Dril
 
 ler; 290 U.S. at 245, 54 S.Ct. 146). It concluded that such a connection was shown when the related patents either expressly incorporated the procedures of the invalidated patent or issued from continuation applications stemming
 
 from
 
 such, and where the patentee’s inequitable conduct (specifically, disclosing a fictitious best mode) in prosecution of the invalid patent formed, a basis for its successful arguments in prosecuting the others.
 
 Id.
 
 at 811, 65 S.Ct. 993.
 

 Bristol argues that the theory of “infectious unenforceability” is not applicable here because the defendants cannot show the requisite “immediate and necessary” relation between Bristol’s conduct in prosecuting the ’001 patent and the ultimate issuance of the ’537 and ’80S patents. The patentee first notes that while the ’001 patent describes methods to reduce peripheral neurotoxicity by administering taxol with a 24-hour infusion regimen, the ’803 and ’537 patents both refer to 3-hour administration. Next, Bristol argues that this divergence resulted from a March 1993 restriction requirement in the grand
 
 *538
 
 parent ’628 application, when the patent examiner recognized that Bristol was claiming “independent and distinct” inventions.
 
 [8]
 

 See
 
 Haas Decl. Exh. 4 (March 8, 1993 Restriction Requirement in Application No. 07/923,628). In response, Bristol in June 1993 filed a divisional patent application, the ’331 parent application, which it claims related only to the short infusion regimen inventions. Bristol Br. at 4; Bristol Statement of Material Facts K22 (“The claims of the ’331 application recited an infusion schedule of ‘not exceeding 6 hours,’ ‘less than 6 hours,’ or ‘about 3 hours’ ... ”). Bristol also proffers that the patent examiner did not “substantively act” on any claims directed to the 3-hour regimen until after the divisional ’331 application was filed. Bristol Reply Br. at 11. Now Bristol argues that because the ’537 and ’803 patents issued from a chain of prosecution separate from the distinct ’001 invention, any alleged inequitable conduct during prosecution of the latter should not be considered here.
 

 Bristol’s argument comes from its reading of the Federal Circuit’s
 
 Baxter Intern., Inc. v. McGaw, Inc.,
 
 149 F.3d 1321 (Fed.Cir.1998), where the Court rejected a challenger’s argument that all patents in suit were infected and invalidated because of a patentee’s failure to disclose prior art material to one patent. All three patents in suit had descended from the same application, through separate divisional applications. Upon examination of the prosecution history, the Court determined that a restriction requirement had split the patentee’s claims into different inventions. It concluded that the withheld prior art invalidated only the issued patents to which it was material: “[Wjhere the claims are subsequently separated from those tainted by inequitable conduct through a divisional application,
 
 and where the issued claims have no relation to the omitted prior art,
 
 the patent issued from the divisional application will not also be unenforceable due to inequitable conduct committed in the parent application.”
 
 Id.
 
 at 1332 (emphasis added).
 

 By analogy to
 
 Baxter,
 
 Bristol states that its own restriction requirement separated claims drawn to 24-hour infusion methods from claims drawn to administration over 6 hours or less. Consequently, “none of the prior art applied against the claims directed to the use of a 24-hour regimen to reduce peripheral neuropathy is material to the patentability of claims of the ’803 or ’537 patents, which relate to the use of 3-hour infusion regimens.” Bristol Br. at 15.
 

 The IVAX defendants respond that the requisite relation is revealed by comparison of the method steps described by the 3-hour ’803 patent and the 24-hour ’001 patent. The ’803 patent, claim 5, describes “[a] method for reducing both hematologic toxicity and neurotoxicity in a patient suffering from ovarian cancer and undergoing Taxol treatment comprising parenterally administering to said patient an antineo-plastieally effective amount of about 135 mg/m2 taxol over a duration of about three hours.” Haas Decl. Exh. 1. And, the ’001 patent, claim 1, discloses “[a] method for reducing peripheral neurotoxicity symptoms in patients suffering from ovarian cancer and undergoing TAXOL ■ therapy comprising reducing peripheral neurotoxicity symptoms in said patients while maintaining an antitumor effect by administering about 135 mg/m2 over a period of about 24 hours.” Haas Decl. Exh. 3. The IVAX parties note that, on their face, the only apparent difference between the method steps described in these claims is the infusion period. And, as this court has explained in its
 
 “Markman
 
 ” Opinion which constructed the patents in suit, the phrases “reducing hematologic toxicity” and “reducing neurotoxicity” in the ’803
 
 *539
 
 patent (and the counterpart phrase from the ’001 patent, “reducing peripheral neu-rotoxicity symptoms”), are not claim limitations, but statements of purpose or intended use. Further, the ’803, ’537, and ’001 patents all include the same specification, based on the OV.9 study, and name the same inventors.
 

 Ben Venue joins IVAX to comment that although Bristol characterizes the March 1993 examiner’s action as establishing a crucial separation between 24-hour and 3-hour taxol regimens, the restriction requirement actually divided Bristol’s pending claims into three groups: Group I claims were drawn to methods employing taxol and a medication; Group II claims referred to methods employing taxol alone; and Group III claims described methods employing taxol and a colony stimulating factor.
 
 See
 
 Haas Decl. Exh. 4. It appears then that, contrary to Bristol’s claim, the examiner did not classify the claims by infusion duration. Examination of the record demonstrates that the claims pending in Group I, which were re-asserted in the applications that led to the ’803 and ’537 patents, recited
 
 both
 
 24-hour and shorter infusion regimens.
 
 See
 
 Mentlik Decl. Exh. B at 55-60 (pending claims 16, 18-19, 24-25, 29-30, 32, 35-37, referring to a 24-hour duration);
 
 ef. id.
 
 at 42-45 (pending claims 1-13, reciting infusions of 6 hours or less).
 

 From the above, the court concludes that Bristol’s assertion that the ’537 and ’803 patents are directed to “mutually exclusive” inventions totally separable from the ’001 patent may be meritless. Although
 
 Baxter
 
 controls, final fact finding will govern its application.
 

 Bristol’s motion for summary judgment to eliminate the defendants’ charges of inequitable conduct arising from alleged conduct during prosecution of the ’001 patent applications on the theory of “infectious unenforceability” is denied.
 

 CONCLUSIONS
 

 Bristol’s motion for summary judgment that it did not commit inequitable conduct in connection with prosecution of the ’537 and ’803 patents is granted in part and denied in part as follows:
 

 1) Summary judgment is denied to the extent that the defendants allege inequitable conduct based on nondisclosure of: a) the O’Connell reference; b) the OV.9 Abstract distributed at a meeting of the National Cancer Institute of Canada in April 1991;
 
 and
 
 c) Bristol’s OV.9 Protocol;
 

 2) Summary judgment is denied concerning iVAX’s charges of inequitable conduct based on Bristol’s purported misstatements and omissions concerning the Kris and McGuire studies;
 

 3) Summary judgment of no inequitable conduct is granted concerning Bristol’s nonresponsive July 25, 1995 statement to the PTO that it had “virtually eliminated the need for premedication”; and
 

 4) Bristol’s motion for summary judgment to eliminate the defendants’ charges of inequitable conduct arising from Bristol’s alleged misconduct in prosecuting the ’001 patent applications is denied.
 

 ORDER
 

 This matter is before the Court on the motion by plaintiff Bristol-Myers Squibb Company for summary judgment that its U.S. Patent
 
 No.
 
 5,641,803 (“the ’803 patent”) and No. 5,670,537 (“the ’537 patent”) are not unenforceable due to inequitable conduct. Having heard oral argument on February 14-15, 2000, upon consideration of the submissions of the parties, and for the reasons stated in the accompanying opinion, it is on this day of March, 2000:
 

 ORDERED that:
 

 1) Summary judgment is denied to the extent that the defendants allege inequitable conduct based on nondisclosure of: a) the O’Connell reference; b) the OV.9 Abstract distributed at a
 
 *540
 
 meeting of the National Cancer Institute of Canada in April 1991; and c) Bristol’s OV.9 Protocol;
 

 2) Summary judgment is denied concerning IVAX’s charges of inequitable conduct based on Bristol’s purported misstatements and omissions concerning the Kris and McGuire studies;
 

 3) Summary judgment of no inequitable conduct is granted concerning Bristol’s nonresponsive July 25, 1995 statement to the PTO that it had “virtually eliminated the need for premedication”; and
 

 4) Bristol’s motion for summary judgment to eliminate the defendants’ charges of inequitable conduct arising from Bristol’s alleged misconduct in prosecuting the ’001 patent applications is denied.
 

 [1]
 

 . “Refractory” is defined as "[r]esistant to treatment, as of a disease.”
 
 Stedman’s Medical Dictionary
 
 1521 (26th ed. 1995).
 

 [2]
 

 . On August 16, 1993, Bristol wrote to the PTO: "There is no teaching or suggestion that Ohnuma’s [a prior art researcher], or anyone else’s, method of administration of taxol would be effective in the treatment of ovarian cancer.” Mentlik Decl. Exh. B at 86. Inventor Dr. Canetta admitted at deposition that this statement "included all prior art including McGuire.” Mentlik Third Suppl. Decl. Exh. Y at 775. And on March 23, 1995, Bristol asserted that “[t]he outstanding rejection relies upon the unsupported premise that at the time the present invention was made, taxol was known to be clinically effective. This is not true, and so the premise fails.” Mentlik Third Suppl. Decl. Exh. X at 595.
 

 [3]
 

 . For example, on May 21, 1996, Bristol represented to the PTO that "Applicants have shown an increase of 16% in the overall objective response rate; up from the prior art’s 0%! Applicants' results are all the more surprising by the fact that all of the patients in the Applicants’ study were considered drug refractory, and thus unlikely to respond to such therapy.” Mentlik Third Suppl. Decl. Exh. X at 677.
 

 [4]
 

 . Bristol’s May 25, 1994 submission to the PTO claimed: "The presently claimed invention goes squarely against the conventional wisdom of the time for achieving an anticancer effect with taxol. At the time the invention was made, the accepted teaching was that higher doses (i.e., >200 mg/m2) were required for achieving an anticancer effect with taxol.” And, "[t]aken together, the prior art suggests that, for all the attendant complications, taxol doses of about 200 mg/m2 or more were required for the efficacious administration of taxol. Thus, there is nothing in the prior art that would have motivated one of ordinary skill in the art to devise and test a taxol treatment regimen requiring the administration of lower doses of taxol.” Mentlik Third Suppl. Decl. Exh. X at 563, 565-66.
 

 [5]
 

 .
 
 See also
 
 Bristol’s January 25, 1994 statement that "The [McGuire] authors expected that higher doses of taxol would be required for an effective therapeutic response.” Ment-lik Decl. Exh. B at 107; and its June 20, 1995 i epresentation that "[o]ther workers similarly acknowledged the inherent difficulties in devising a TAXOL treatment regimen, and, like McGuire, concluded that higher doses were required for an anticancer effect.” Mentlik Third Suppl. Decl. Exh. X at 620.
 

 [6]
 

 . Rowinsky et al., "Taxol: The First of the Taxanes, an Important New Class of Antitu-mor Agents,” 19 Seminars in Oncology 646 (1992) (coauthored by Canetta)' (Mentlik Third Suppl. Decl. Exh. Z); Eisenhauer et al., "European-Canadian Randomized Trial of Pacli-taxel in Relapsed Ovarian Cancer,” 12 Journal of Clinical Oncology 2654 (1994) (Mentlik Sec. Suppl. Decl. Exh. M); Trimble et al., "Paclitaxel for Platinum-Refractory Ovarian Cancer,” 11 Journal of Clinical Oncology 2405 (1993) (coauthored by Canetta) (Mentlik Third Suppl. Decl. Exh. AA); Arbuck et al., "Clinical Development r of Taxol,” J. Nat’l Cancer Inst. Monographs No. 15 (1993) (coauthored by Canetta) (Mentlik Third Suppl. Decl. Exh. BB).
 

 [7]
 

 . "The MPEP [is] commonly relied upon as a guide to patent attorneys and patent examiners on procedural matters.”
 
 Molins,
 
 48 F.3d at 1179 n. 9 (citation omitted). While the MPEP does not have the force of law, it is entitled to judicial notice as an official interpretation of statutes or regulations as long as it is not in conflict therewith.
 
 Id.
 

 [8]
 

 . Under 35 U.S.C. § 121, if two or more distinct inventions are claimed in one application, the examiner may require an applicant to restrict its application to one of the several inventions. The applicant may then make the other invention the subject of a divisional application which is entitled to the original filing date.